706 So.2d 1164 (1997)
Greg BARNETTE and Mike Mosko
v.
John WILSON.
1960308-CER.
Supreme Court of Alabama.
November 14, 1997.
*1165 S. Greg Burge and Joseph W. Buffington of Heninger, Burge & Vargo, Birmingham, for plaintiffs.
J. Bernard Brannon, Jr., of Brannon & Guy, P.C., Montgomery, for defendant.
HOOPER, Chief Justice.
Greg Barnette and Mike Mosko, both former City of Montgomery police officers, filed a slander action against John Wilson, the chief of police for the City of Montgomery, in the United States District Court for the Middle District of Alabama. That federal court, acting pursuant to Rule 18, Ala.R.App.P., certified to this Court the following question:
"Is a person who publishes a slander at a press conference responsible for damages caused by the expected and intended repetition of the slander by the news media?"
The federal district court set out the following facts in its certification to this Court: Barnette and Mosko were, during the period 1989-90, members of the "Return our Turf" team ("ROT"), a division of the Narcotics and Intelligence Bureau of the Montgomery Police Department. The captain of the ROT team during this period was Larry Armstead. Capt. Armstead began receiving anonymous telephone tips indicating that particular members of the team would stop suspects and, if they found drugs and money on the suspects, would take the money but not make an arrest. Mosko was one of two officers specifically referred to in the telephone tips by their nicknames. Mosko's nickname was "Old Dude." On one occasion when Capt. Armstead was out with the ROT team executing a search warrant, he spotted money and jewelry in the apartment being searched; later, after two ROT team officers, the plaintiff Greg Barnette and Officer Marty Wooten, had entered and exited the room, the jewelry was gone.
Based upon the telephone tips, his personal observation, and confidential conversations with other officers in the department, Capt. *1166 Armstead set up a "sting" operation that targeted six members of the ROT team. The sting was executed by using a police department trainee posing as a crack cocaine dealer. The police planted $2,300 and 9 grams of cocaine in an apartment. Two officers arrested the trainee outside the apartment, and Officers Barnette, Mosko, Wooten, and Bertarelli entered the apartment. After the officers left the apartment, both the money and the drugs were gone.
The four officers were detained and were questioned at police headquarters. Another officer was instructed not to let the officers out of his sight while they were detained. At some point, each of the four officers was allowed to visit the restroom unattended. Later, a body search of each of the four disclosed $560 on Bertarelli (approximately one-fourth of the total), but no money was found on the other three officers. A large portion of the money was found in the sewer line of the police station. Bertarelli stated that in the apartment Wooten had approached him, holding four envelopes, and that Wooten handed him one of the envelopes, which contained one-fourth of the money that had been in the apartment.
Early the next morning, the four officers were called back to the police station and were presented with three alternatives. An attorney retained by the Police Benevolent Association acted as an intermediary with the ROT team officers and the police department officials. The first two alternatives would have had Bertarelli and Wooten go to jail and would have had Mosko and Barnette become the subject of a messy public investigation that the police chief guaranteed would result in the firing of both officers. The third alternative was that if all four officers resigned immediately, the department would not press criminal charges and would not release to the press the names of the four.
All four men immediately tendered written resignations, although Barnette and Mosko maintained that they were innocent. Fifteen minutes later, Chief Wilson stated at a press conference: "I feel like we accomplished what we wanted to do. We found four dirty cops and four dirty cops are gone." At this same conference, Chief Wilson specifically named the four ROT team officers involved. As a result of the press conference, the local news media published related stories for several weeks.
Officers Mosko and Barnette filed a defamation action against Police Chief Wilson. A jury returned a verdict in favor of the plaintiffs on the slander claim. Wilson moved for a judgment as a matter of law. See Rule 50(a), F.R.Civ.P. He claimed that he was not liable for damage resulting when the news media repeated his statement. The federal district court determined that the case involved a question of law without "clear controlling precedent" and certified the question to this Court.
A jury has found that the original publication by Chief Wilson was slanderous. The federal district court has certified its question. Because the jury has already returned a verdict in this case and the federal court has asked a certified question of limited scope, this Court may not address the merits of the slander action against Chief Wilson. We must limit our discussion to answering the certified question.
"The general rule is that one who publishes a defamatory statement will not be held liable for the repetition of it by others. 53 C.J.S. Libel and Slander § 85. When, however, the second publication is a natural and probable consequence of the first, the initial publisher is responsible for it. Giordano v. Tullier, 139 So.2d 15 (La.App.1962). `Where there were circumstances, known to the original defamer at the time of his publication that might reasonably lead him to expect a repetition, he is responsible for it.'" Davis v. National Broadcasting Co., 320 F.Supp. 1070, 1072 (E.D.La.1970). In Davis, the plaintiff sued NBC as the original publisher of a defamatory statement that was reprinted six weeks later in a newspaper.
In Muirhead v. Zucker, 726 F.Supp. 613 (W.D.Pa.1989), the plaintiff alleged that a news release concerning a lawsuit was false and defamatory and had been motivated by malice. The defendants claimed that they *1167 had only provided information to the newspaper and argued that they could not be held responsible for the results that followed the newspaper's publication of that information. The court stated that this line of reasoning was "ludicrous." 726 F.Supp. at 617.
An actor is presumed to intend the logical outcome of his actions. One who publishes a defamatory statement to news media will not be shielded from liability just because the harm to the person defamed has resulted from the republication by the news media. Once a person makes a defamatory publication, the person defamed has a cause of action.
Normally, the original publisher of a defamation is not responsible for the consequences of its repetition by others. While we find no prior Alabama case law directly on point, this Court will follow the lead of other jurisdictions that have considered this issue and have created an exception to the general rule: When the original publisher of a defamatory statement might reasonably expect the statement to be repeated, the original publisher is responsible for the damage that results from that repetition of the slander. Therefore, the answer to the certified question is yes.
QUESTION ANSWERED.
KENNEDY, J., concurs.
MADDOX, ALMON, HOUSTON, and SEE, JJ., concur specially.
SHORES and COOK, JJ., concur in the result in part and dissent in part.
HOUSTON, Justice (concurring specially).
I concur because of the way the question is presented:
"Is a person who publishes a slander at a press conference responsible for damages caused by the expected and intended repetition of the slander by the news media?"
By concurring, I am not agreeing that the repetition of the alleged defamatory information in a newspaper or on radio or television is a slander. I believe that if, with the intent to have them published by radio, television, or newspaper, one presents defamatory statements to reporters from those media, the publication of the defamatory statements by those media is the publication of a libel and not the publication of a slander. See Restatement (Second) of Torts, § 568 cmt. f (1977); First Independent Baptist Church of Arab v. Southerland, 373 So.2d 647 (Ala. 1979). But that is not the question certified to this Court.
MADDOX, ALMON, and SEE, JJ., concur.
COOK, Justice (concurring in the result in part and dissenting in part).
The question certified to this Court actually involves two separate issues. The first issue is purely a question of proximate cause, namely, whether a police chief, who conducts a press conference to explain to attending representatives of the radio and newspaper media how an undercover "sting operation" had resulted in the dismissal of police officers in his employ, may be liable for the subsequent dissemination by those media of defamatory remarks the police chief made about the terminated officers at the press conference. The second distinct issue is whether the police chief's defamatory remarks in the preceding instance constitute libel, rather than slander. The "question," as it has been certified to this Court, cannot be addressed without first resolving both of these issues.
I would answer both questions in the affirmative. Insofar, therefore, as the majority opinion supports the jury's award of compensatory damages, I concur in the result. Insofar, however, as the majority opinion holds that the defamatory remarks were slander, which is the only basis on which the jury could have awarded punitive damages, I cannot agree.

I. Proximate CauseCompensatory Damages
As to the extent of liability of the original publisher of defamatory material for damage caused by its subsequent publications, the rule is as follows:
"So far as `proximate cause' is concerned, recovery has been limited very definitely to those damages which are regarded *1168 as reasonably foreseeable or normal consequences of the defamation. Formerly it was held that the original defamer was liable only for the damages caused by his own publication, and was not responsible for repetition by others, on the theory that the `last human wrongdoer' must be responsible, and there is still some authority to this effect; but there has been the same broadening of `proximate cause' as in other fields of liability, and the prevailing view now appears to be that there is liability for damages due to such a repetition when it was authorized or intended, or when the circumstances were such that it might reasonably have been anticipated."
W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on the Law of Torts § 112, at 795 (5th ed.1984) (emphasis added; footnotes omitted). The Restatement describes the rule similarly:
"The publication of a libel or slander is a legal cause of any special harm resulting from its repetition by a third person if, but only if,
"(a) the third person was privileged to repeat it, or
"(b) the repetition was authorized or intended by the original defamer, or
"(c) the repetition was reasonably to be expected."
Restatement (Second) of Torts § 576 (1977).
The statements made by Chief Wilson fall squarely within this rule. Consequently, I would hold that the jury in this case could have awarded compensatory damages on the ground that Chief Wilson's initial statements were the proximate cause of harm resulting from the foreseeable and intended repetition by the media. Therefore, I concur in the result as to the award of compensatory damages.[1]

II. LibelPunitive Damages
The award of punitive damages, however, is quite another matter. Ala.Code 1975, § 6-5-186, provides:
"Vindictive or punitive damages shall not be recovered in any action for libel on account of any publication unless (1) it shall be proved that the publication was made by the defendant with knowledge that the matter published was false, or with reckless disregard of whether it was false or not, and (2) it shall be proved that five days before the commencement of the action the plaintiff shall have made written demand upon the defendant for a public retraction of the charge or matter published; and the defendant shall have failed or refused to publish within five days, in as prominent and public a place or manner as the charge or matter published occupied, a full and fair retraction of such charge or matter."
(Emphasis added.)
It is undisputed that the plaintiffs did not solicit a retraction, as required by § 6-5-186. Consequently, the punitive damages awarded by the jury in this case are authorized by Alabama law only if Chief Wilson's remarks are properly characterized as slander. I would hold that they are not.
"`Libel consists of the publication of defamatory matter by written or printed words, by its embodiment in physical form or by any other form of communication that has the potentially harmful qualities characteristic of written or printed words.'" First Indep. Baptist Church of Arab v. Southerland, 373 So.2d 647, 649 (Ala.1979) (quoting Restatement (Second) of Torts § 568; emphasis in Southerland). Southerland held that statements made in tape-recorded sermons broadcast from a radio stationwere, if defamatory, libel rather than slander. 373 So.2d at 650.
Consistent with that case is the view that "[a] publication of a libel may be made by an oral communication that is intended to be, and is, reduced to writing ... or when a statement is given orally to a newspaper reporter and is published in the paper." Willis v. Perry, 677 P.2d 961, 963 (Colo.App. 1983) (quoting Restatement (Second) of Torts *1169 § 568 cmt. f (1977) (emphasis added)); see also Newton v. Family Federal Savings & Loan Ass'n, 48 Or.App. 373, 616 P.2d 1213 (1980).
It would be anomalous and unjust to hold Chief Wilson liable for damages flowing from publications in forms which, if the action had been brought against the republishing media, would, by definition, be the basis of a cause of action for libelnot slanderbut, at the same time, deny him the benefit of § 6-5-186, to which the republishing media would be entitled. I consider Chief Wilson's statements, to the extent they are defamatory, different in no substantive respect from dictations made to a stenographer for written dissemination. See Restatement (Second) of Torts § 568 cmt. f (1977) ("[O]ne who dictates to a stenographer a letter that defames a third person may become liable for libel on the basis of the oral communication when the stenographer takes it down, even though no other person sees it"). I would hold that Chief Wilson's statements are subject to § 6-5-186, and, consequently, are not subject to the imposition of punitive damages. To the extent, therefore, that the majority opinion characterizes the defamation as slander and supports the imposition of punitive damages, I respectfully dissent.
SHORES, J., concurs.
NOTES
[1] Although Restatement § 576 limits the application of this rule to "special harm," which it defines as "the loss of something having economic or pecuniary value," § 575 cmt. b, no issue has been presented to us regarding the type of compensatory damages awarded, that is, general or special.